EXHIBIT "A"

Filing # 167538684 E-Filed 02/24/2023 06:05:49 PM

IN THE CIRCUIT COURT FOR THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA

TIMMIE LEE KNOX, JR.,

CASE NO:

     Plaintiff,

v.

RIC BRADSHAW, in his capacity as Sheriff
of Palm Beach County, Florida, and
DEPUTY SHERIFF DUSTIN SULLIVAN,
individually,

     Defendants.

_____/

## COMPLAINT

Plaintiff, TIMMIE LEE KNOX, JR., ("TIMMIE"), sues RIC BRADSHAW, individually,

and in his official capacity as the Sheriff of Palm Beach County ("BRADSHAW"), and DEPUTY

SHERIFF DUSTIN SULLIVAN, individually ("SULLIVAN"), and states as follows:

### Introduction

1.    This case involves unjustified use of excessive force by officers of the PALM

BEACH COUNTY SHERIFF'S OFFICE ("PBSO"). Acting consistent with PBSO's pattern and

practice, and failing to identify, train, and discipline deputy sheriffs who have engaged in

unjustified use of force, SULLIVAN Tasered TIMMIE, a 17-year-old young child with his back

turned who posed no threat to any officer. Consistent with PBSO's pattern and practice,

BRADSHAW and PBSO approved and ratified SULLIVAN's conduct, leaving TIMMIE suffering

with permanent and debilitating injures resulting in total paralysis from the neck down.

### Jurisdiction and Venue

2.    TIMMIE seeks damages for both state law and federal law claims for damages

exceeding $50,000, exclusive of interest and costs.

3.      Venue is proper in Palm Beach County, Florida, because (a) the conduct from which the claims arise occurred in Palm Beach County, and (b) Defendants have offices, work, and/or reside in Palm Beach County.

4.      On or about October 13, 2021, TIMMIE provided written notice of his claim, via certified mail, and pursuant to section 768.28 of the Florida Statutes, to Sheriff Ric Bradshaw, PBSO, the Palm Beach County Board of County Commissioners, and the Florida Department of Financial Service. Copies of the letter and green cards are attached as Composite *Exhibit "A." The Department of Financial Services or the appropriate agency failed to make final disposition of the claim within 6 months, which is deemed a final denial of the claim.

### Parties

5.      TIMMIE is an 18-year old African-American male who, at all materials times, has resided in Palm Beach County, Florida.

6.      Since January 2005, BRADSHAW has been the Sheriff of Palm Beach County, Florida. BRADSHAW is the final policymaking authority in matters of law enforcement in Palm Beach County. He is responsible, among other things, for hiring, training, and supervising PBSO deputy sheriffs, and for establishing, enforcing, and, if necessary, revising the policies, procedures, customs, and practices of PBSO.

7.      Defendant SULLIVAN is employed as a deputy sheriff with PBSO. He works under the supervision and control of BRADSHAW.

### Background Allegations

*The Use of Force: A Pattern of Abuse*

PBSO's General Order 500 states that "the most important purpose of law enforcement is the

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-GsiLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

protection of human life."

    8.    PBSO deputy sheriffs have increasingly, and alarmingly, used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force. This conduct includes initiating "stop and frisk" encounters without reasonable suspicion (particularly in areas targeted as "high crime" and populated by persons of color), using excessive levels of force which are uncalled for under the circumstances, and escalating force without a reasonable basis, needlessly endangering lives and safety.

    9.    PBSO's excessive force incidents have been progressing toward a carelessly militant and aggressive form of policing where deputies have purposely or recklessly disregarded the protection of human life. Between January 2005, when BRADSHAW became Sheriff, and October 2010, PBSO deputies shot 31 people, killing 16.  Among the shootings that occurred during this time period:

> *In 2005, a group of deputies opened fire on John Garczynski, 37, a suicidal energy trader holding a gun to his own head;

> *In 2006, Chester Washington was shot and killed by a deputy sheriff near Jupiter after being tased by a Taser and appearing to reach into his pants. Deputies later learned that he was carrying a pocket knife but no gun.

> *In 2007, an unarmed 21-year-old, Andy Jackson II, was shot in the head by a deputy sheriff who claimed that Mr. Jackson lowered his hands toward his waist-

> band as if reaching for a weapon. Mr. Jackson fell into a coma and was placed on life support, but he was able to survive the shooting, suffering permanent partial memory loss and loss of full use of his dominant hand.

---

* In 2008, deputies followed a car into a parking lot at night. After the car appeared to accidentally bump into the police vehicle, causing no damage, a Deputy Sheriff shot and killed the unarmed driver, Ruben DeBrosse, 16. He later claimed to be in fear that DeBrosse was trying to run him over.

* In 2008, Adam Phillips, a drug addict with no history of violence, who was scheduled to enter a rehabilitation facility in three weeks, stole his mother's car. The car's engine failed on Federal Highway in Boynton Beach. A team of deputy sheriffs came to the scene and surrounded the car, ordering Mr. Phillips to get out. He did not get out, but he also had taken no threatening action, and was not armed, when a deputy sheriff shot him dead. PBSO conducted no formal investigation, then found that the officer involved committed no wrongdoing.

* In 2010, a deputy sheriff shot and wounded a mentally impaired teenager who allegedly lunged his vehicle toward the deputy.

10.     Of these 31 shootings, 30 were found by PBSO to be justified, often following little or no investigation.

11.     In October 2010, the *Palm Beach Post* published a lengthy article about the rash of police shootings and the lack of thorough investigations.  Through this public reporting, BRADSHAW was placed on notice of numerous deficiencies in PBSO's approach to the use of force, particularly officer involved shootings.  A number of unjustified shootings also led to lawsuits, resulting in the payment of awards or settlements, which further served to put BRADSHAW on notice of the need for better policies, procedures, customs, and practices.

12.     Nonetheless, the pattern of abuse continued. In 2011, PBSO deputy sheriffs abused Angelo Kallas by beating him with a flashlight and tasering him with a Taser at least seven times as officers tried to get the handcuffed man into the back seat of the patrol car. Kallas was detained after crashing his vehicle because he was under the influence of synthetic marijuana. https://www.palmbeachpost.com/story/news/2014/05/10/pbso-deputies-accused-excessive/6820894007/

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

13.     In 2012, PBSO officers were involved in eight shootings, six of them fatal. Among

those who were killed:

> * Michael Camberdella, an 18-year-old bipolar boy who was involved in a domestic incident with his mother. When police arrived, the boy was standing in front of his home, holding a hammer and hedge shears. The deputy sheriff claimed that Mr. Camberdella, who had no criminal history, ignored commands to get on the ground and started walking toward him. The boy's family was left to wonder why the officer did not use his Taser before firing the fatal shots.

> * Victor Arango was shot and killed by a PBSO deputy sheriff outside a suburban Boynton Beach bar. Mr. Arango reportedly was trying to break up a fight involving his girlfriend. The deputy claimed that Mr. Arango began fighting with another deputy and reached for a gun in his waistband. But claims of the threat posed by Mr. Arango were belied by the fact that he had broken his left hand just days before the shooting and was still wearing a cast. Moreover, witnesses – including a rookie Deputy – said the deputy sheriff disarmed Mr. Arango and then opened fire.

> *Seth Adams, who found an individual apparently trespassing in Adam's driveway, ordered the individual off his property, and became involved in a confrontation. Claiming that he feared that Adams was reaching for a weapon, the individual who turned out to be a deputy sheriff who shot Adams four times: twice in the head, once in the abdomen, and once in the forearm. Adams, who was unarmed, died at age 24.

14.     Despite this pattern of excessive force and conduct, the deadly and near-deadly

shootings and Tasering continued. In 2013, PBSO Deputy Adams Lin shot unarmed Dontrell

Stephens in the back resulting in paralysis. The case garnered national media attention. A Fort

Lauderdale jury found that officer Lin engaged in excessive force, resulting in an over $30 million

verdict and later a Special Claims bill being approved by the Legislature. See,

https://www.abcactionnews.com/news/state/desantis-approves-6m-for-man-paralyzed-by-

deputy-shooting. Deputy Lin was not only cleared of any wrongdoing in a grossly deficient

internal investigation, he was promoted to the rank of Sergeant and assigned as a Training Officer.

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmfJkrcA?e=nZ2FT2

15.     The Sheriff's office, despite this clear finding of excessive force, continues to

engage in excessive force, with ratification by Sheriff Bradshaw:

> *In 2013, Shawn Conboy, a former U.S. marshal, was thrown against the hood of
> a car and shot twice with a stun gun by three PBSO deputy sheriffs. The deputy did
> this after Conboy stopped to help victims of a fatal car crash west of Boca Raton.
> https://www.palmbeachpost.com/story/news/crime/2016/06/01/u-s-case-could-
> make/6818027007/
>
> *In 2014, a PBSO deputy sheriff struck a person in the head with his knee twice
> and used a stun gun on him "four to five times", in response to the person
> concealing their hand under their shirt. https://www.sun-sentinel.com/local/palm-
> beach/fl-ne-pbso-deputy-use-of-force-20201102-b2wak3agfbaefh2qmzf6wn5inm-
> story.html
>
> *In 2019, a PBSO deputy sheriff recklessly shot nine times at a moving vehicle in
> heavily populated area after the perpetrator fled the scene. The driver of the vehicle
> was Fakeria Shazay Phillips.  PBSO's internal investigation of the incident
> concluded that the deputy's actions were "reckless" and "and his disregard for the
> life and well-being of others created an imminent threat to PBSO deputies and the
> community at large." Bradshaw, nevertheless, failed to respond appropriately to
> this confirmed excessive use of force.
>  https://www.palmbeachpost.com/story/news/crime/2020/11/18/pbso-suspends-
> deputy-who-fired-at-fleeing-driver-calls-use-of-force-unjustified/6257310002/
>
> *In 2020, 19-year-old black male, Kevin Wygant, was shoved into a wall by a
> PBSO deputy sheriff after he was already handcuffed behind his back. As the
> deputy bruised and battered the young man in public, he threatened to show him
> what "freedom of speech is." The deputy did this in response to a call about a fight
> at a Tijuana Flats in Wellington. (https://www.sun-sentinel.com/local/palm-
> beach/fl-ne-pbso-deputy-use-of-force-20201102-b2wak3agfbaefh2qmzf6wn5inm-
> story.html)

16.     PBSO's use of Tasers mirrors its use of guns, resulting in an alarming number of

incidents which increase the risk of harm to people, without justification.

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-
barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZ8oYIPQu1GYQmfIkrcA?e=nZ2FT2

17.     The trend of increased use of force shows no sign of letting up.  BRADSHAW is on notice of this trend but has not acted to stop it.  PBSO has created a Post-Critical Incident Assessment Team to meet, discuss, and evaluate shootings.  But the team is directed to produce no formal reports and draw no official conclusions.  It is thus, by design, incapable of determining whether an officer involved in a shooting is in need of training, discipline, or other remedial action.  Moreover, PBSO's training division does not conduct formal reviews of officer involved shootings.

18.     BRADSHAW routinely makes public statements, shortly after an officer involved shooting, justifying and/or defending the shooter's actions.  For example, BRADSHAW made public statements of support for the deputy sheriffs involved in the De Brosse, Camberdella, Arango, Adams, Joseph and Stephens shootings described above, and a PBSO spokesman acting on BRADSHAW's behalf made public statements of support for the deputy sheriff involved in the Phillips shooting.  These statements made before any reasonable investigation was or ever reasonably could have been concluded, send the message to PBSO deputies that the use of deadly force is condoned without any serious review of or regard for justification and will not result in any adverse consequences.  This message is strongly reinforced when PBSO declares a shooting "justified" with little or no investigation, a formal ratification of the officer conduct.

19.     Indeed, PBSO routinely performs cursory investigations of incidents involving the questionable use of deadly and excessive force on the part of deputy sheriffs, with an eye toward exonerating the officers rather than finding the truth.  Investigating officers and supervisors uncritically endorse officers' versions of events, even when those versions are incomplete, inconsistent, and clearly contradicted by objective evidence such as audio and video recordings.

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZBoYlPOu1GYQmflkrcA?e=nZ2FT2

As a result, incidents involving the questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

20. The use of practical and available technology to document facts surrounding the questionable use of force (such as lapel video cameras) has been ignored in an apparent effort to perpetuate the ability to endorse officers' versions of events without the need to confront conflicting documentary evidence.

21. Due to this intentionally inadequate investigative process, in virtually all officer involved shootings, PBSO has declared the conduct of the officer who pulled the trigger to be "justified." As the Palm Beach Post noted in an article published on January 11, 2013: "It's been years since either the Sheriff's office or prosecutors have deemed any police shooting in Palm Beach County unjustified."

22. The consistent lack of accountability within PBSO for the questionable and even clearly established unjustifiable use of deadly and excessive force evinces a reckless and even intentional disregard for the constitutionally required constraints on the use of such force by PBSO officers. It has, in turn, promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens. The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

23. Problems created by the failure to properly investigate officer involved shootings and other uses of force, or to take appropriate disciplinary action, are only exacerbated by the failure to train, or re-train, officers involved in use of force incidents.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

24.     Less than five months before the STEPHENS shooting, BRADSHAW wrote, in an article entitled "Well-Trained Officers Are Crucial to PBSO's Mission," that "every time we have a serious incident, our training staff reviews the outcome and determines whether we need to change policies or response. The same goes for all use-of-force incidents, no matter how small. We learn from every incident."

25.     Yet, as noted above, PBSO's training division does not conduct formal reviews of officer involved shootings.   When officer conduct is approved through a formal finding of justification, no additional training is required.

26.     The failure and refusal of BRADSHAW to competently investigate use of force incidents, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly and expressly condone the egregious misconduct of the deputies involved.  The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and substitutes in their place a permissive de facto custom and practice of tolerating and promoting excessive force, which will invariably have the effect of promoting similar misconduct by other deputies in the future.  In sum, the pattern and practice of the excessive use of force on the part of PBSO officers stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of the use of deadly and excessive force.

*Deputy Sullivan: Careless, Confrontational and Reckless*

27.     Deputy Dustin Sullivan was hired by PBSO on July 27, 2016 and is notorious in Palm Beach County for his careless, confrontational and reckless disposition.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmfIkrcA?e=nZ2FT2

28.     Shortly before his one-year anniversary as a deputy, on May 12, 2017, SULLIVAN's reckless disregard for life was exemplified in a deputy-involved shooting. SULLIVAN carelessly shot and injured a 4-year-old K-9, who later underwent surgery.

29.     In a YouTube video, posted on February 1, 2021, SULLIVAN's confrontational approach to an innocent woman of Palm Beach County is illustrated while he was in the process of detaining an African-American male. As the woman stood, a harmless bystander recording the incident, SULLIVAN aggressively approaches her and says, "the transport van's here so if you want to go you can go, it's really easy." See, https://www.youtube.com/watch?v=7rmvp6BnZow

30.     PBSO has a responsibility to the community to identify and assist deputies who display careless, confrontational, and reckless traits, and employ measures to prevent incidents involving excessive force.

31.     In ostensible fulfillment of its responsibility to the community to timely detect problematic behaviors, PBSO has established an "Early Intervention System" or EIS. The Early Intervention System, among other things, flags officers involved in five use of force incidents within a 12-month period, or five "incident reviews" within the last twenty-four months. The system is supposed to identify officers who may be in need of further training, increased supervision, or other remedial action.

32.     BRADSHAW was on notice through the EIS System and otherwise of problems with SULLIVAN's behavior, yet, by the actions of PBSO supervisors working pursuant to his direction and control, Bradshaw repeatedly ratified (and even re-ratified) Sullivan's increasingly aggressive and confrontational conduct.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6sILsoBfUlZ8oYlPOu1GYQmfIkrcA?e=nZ2FT2

33.    PBSO failed to discipline SULLIVAN, or even recommend further training as a result of Early Intervention System alerts. PBSO's ratification of SULLVAN's reckless conduct only served to further encourage his pattern, and the agency's pattern of using deadly force unjustifiably.

### *PBSO's Use of Force Policies*

34.    In order to justify the use of force, especially deadly force, law enforcement officers must use great care in evaluating whether the individual poses a risk of imminent death or great bodily harm to the officer or others, or whether the individual is the perpetrator of a felony, which involves the use or threatened use of deadly force. The use of deadly force is justified in only very rare circumstances and it must then be administered with the greatest of care to protect human life.

35.    In fact, PBSO's Use of Force Policy provides as follows:

> **"The most important purpose of law enforcement is the protection of human life. In order to be consistent with that purpose, the use of force must be limited to situations involving resistance to arrest, defense against physical assault, or force necessary to perform official duties and or self-defense or in the defense of others."**

See, PSBO Use of Force, General Order 500.00, **Exhibit "B."**

36.    Deadly force is defined by the policy as "force which is likely to cause death or great bodily harm." Great bodily harm is defined as "bodily injury which involves a substantial risk of death, serious permanent disfigurement, or protracted loss of impairment of function of any part or organ of the body." See, id.

37.    Factors to be considered when evaluating the reasonableness of force include:

a. The seriousness of the crime or offense

b. The level of threat or resistance presented by the subject;

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

    c. Whether the subject was posing an imminent threat to employees or a danger to the community;

    d. The potential for injury to citizens, employees or subjects;

    e. The risk or apparent attempt by the subject to escape;

    f. The time available to an employee to make a decision;

    g. The availability of other resources;

    h. The training and experience of the employee;

    i. The proximity or access of weapons by the subject;

    j. Age, size, strength;

    k. Environmental factors

38.    The policy further provides that deadly force shall not be used to apprehend perpetrators of non-violent crimes against property.

39.    PBSO also has specific policies related to use of force with Electronic Control Devices (ECD) such as Tasers. Policy 551.00 of the General Orders provides as follows:

"PBSO requires all sworn personnel to maintain and demonstrate proper proficiency with both lethal and less-lethal weapons. To ensure this proficiency level is maintained, all sworn personnel must attend and complete annual in-service training, as well as qualify annually. Employees will be responsible for ensuring, if necessary, that appropriate medical aid is rendered after use of lethal or less lethal weapons." See, Authorized Weapons and Ammunition, General Order 551.00, **Exhibit "C."**

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPQu1GYQmflkrcA?e=nZ2FT2

40.     Under the Authorized Weapons and Ammunition General Order, an Electronic Control Device ("ECD") or "Taser" is defined as a "defensive weapon that transmits electrical impulses to override the sensory and motor nervous system."

41.     Section VI of the Authorized Weapons and Ammunition governs Electronic Control Devices (ECD).  The policy sets forth the following: "Before activating the ECD, the Deputy will issue the verbal warning "TASER" if practical, indicating their intention to give other deputies time to disengage from the subject." See, Authorized Weapons and Ammunition, General Order 551.00 **Exhibit "C."**  In the real time video footage from the incident in question, no such warning was given.

42.     Subsection W of the policy specifically identifies circumstances when ECD's should NOT be used, absent exigent circumstances, including but not limited to:

- **"When the intended target is in any area where a fall could result and cause further injury, i.e. ladder, stairwell, _roof_."**
- **When the subject is in or around water where drowning could result, i.e. pool, canal.**
- **On a handcuffed subject unless doing so is necessary to prevent them from causing serious bodily injury to themselves or others and if lesser attempts of control have been deemed ineffective.**

43.     Subsection L of the policy also addresses use of ECD's on fleeing subjects, as follows: **"Deputies should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use an ECD on a fleeing subject."**

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-GsjLsoBfUIZ8oYlPOu1GYQmfjkrcA?e=nZ2FT2

44.     Subsection G of the policy addresses multiple deployments of an ECD device, as follows: **"When personnel deploy an ECD for the initial automated cycle (5 seconds), the Deputy will evaluate the situation to determine if subsequent cycles are necessary.  Subject exposure to the ECD for more than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of serious injury.**

45.     According the 2011 Edition of the Electronic Control Weapon Guidelines, published by the Police Executive Research Forum and the U.S. Department of Justice's Community Oriented Policing Services, fleeing should not be the sole justification for using an ECD against a subject.  "Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use and ECW on a fleeing subject."

46.     In 2021, Axon Enterprise, Inc. ("Axon"), was the manufacturer of PBSO's department-issued Taser guns. Axon refers to its Tasers as Taser Conducted Energy Weapons, or "CEWS." Axon's manufacturer warnings to law enforcement, in effect at the time of TIMMIE's tasering, warned as follows:

- When used as directed in probe-deployment mode, CEWs are designed to temporarily incapacitate a person from a safer distance than some other force options, while reducing the likelihood of death or serious injury. However, any use of force, including the use of a CEW, involves risks that a person may get hurt or die due to the effects of the CEW, physical incapacitation, physical exertion, unforeseen circumstances or individual susceptibilities. **Following the instructions and warnings in this document will reduce the likelihood that CEW use will cause death or serious injury.**

- When practicable, avoid using a CEW on a person in the following circumstances unless the situation justifies an increased risk:

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYIPOu1GYQmfIkrcA?e=nZ2FT2

14

*• is on an elevated or unstable surface (e.g., tree, roof, ladder, ledge, balcony, porch, bridge or stair);*

*• could fall and suffer serious injury to the head or other area;*

• could fall on a sharp object or surface (e.g., holding a knife, falling on glass);

• is less able to catch or protect self in a fall (e.g., restrained or handcuffed);

• has known impaired reflexes (e.g., from alcohol, drugs or certain medications);

*• is running or moving under momentum;*

*• is operating or riding any mode of transportation* (e.g., vehicle, bus, bicycle, motorcycle, or train), conveyance (e.g., escalator, moving walkway, elevator, skateboard, rollerblades), or machinery; or

*• is located in water,* mud or marsh environment if the ability to move is restricted.

- Minimize the number and duration of CEW exposures. Most human CEW lab testing has not exceeded 15 seconds of CEW application, and none has exceeded 45 seconds. Use the shortest duration of CEW exposure objectively reasonable to accomplish lawful objectives, and reassess the subject's behavior, reaction and resistance before initiating or continuing the exposure. If a CEW deployment is ineffective in incapacitating a subject or achieving compliance, consider alternative control measures in conjunction with or separate from the CEW.

- Drive-stun mode is for pain compliance only. The use of a handheld CEW in drive-stun mode is painful, but generally does not cause incapacitation. Drive-stun use may not be effective on emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect. Avoid using repeated drive-stuns on such individuals if compliance is not achieved.

<u>See</u>, Axon Taser Handheld CEW Warnings, Instructions and Information: Law Enforcement, https://axon-2.cdn.prismic.io/axon-2/5469f58a-629b-4042-ad7e-6069b10667a2_law-enforcement-warnings%2B8-5x11.pdf.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

*PBSO's Pattern of Unjustified Use of ECD's or Tasering Guns*

47.     Despite the enumerated policies and manufacturer warnings, PBSO has for years carried out a pattern and practice of excessive force in its use of weapons, including ECD's. Each and every time, PBSO finds the level of force to be reasonable and necessary, encouraging deputies to violate the rules, manufacturer's guidelines, and PBSO written policies, thereby placing both the persons involved in the incident and many times the public, at risk of serious harm. As illustrated below, the conduct demonstrates the "shoot first" culture of PBSO, followed by a swift affirmation of acceptance of the conduct.

48.     The following are illustrations of PBSO's excessive use of ECD's, ratified and approved by Sheriff Bradshaw, in the five years up to and including TIMMIE KNOX's Tasering:

- *March 9, 2017-* PBSO deputy deploys a Taser on a fleeing subject resisting arrest on a "felony drug charge." Deployment is in violation of policy due to the fact the subject was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

- *March 22, 2017-* PBSO deputy deploys a Taser on a fleeing person under arrest for burglary and grand theft (i.e. non-violent crimes against property). Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

---

*\*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6sjLsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *March 23, 2017*- PBSO deputy deploys a Taser on a suicidal patient in custody at MD Now. The report indicates that the patient was resisting while PBSO deputies were holding his arm. The ECD was deployed twice into the patient's lower back. The patient suffered injuries to his face. Deployment is in violation of policy due to the fact the person committed no crime and was in the custody of PBSO deputies. PBSO determines the use of force was reasonable and necessary.

- *March 23, 2017*- PBSO deputy deploys a Taser on a fleeing person suspected of burglarizing property and attempting to flee on foot. PBSO deputies deploy the Taser striking the person in the right upper back, and then again, missing the subject. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

- *March 30, 2017*- PBSO deputy Tasers a person suspected of a "possible drug transaction." The person flees on foot and is Tasered in the back resulting in injuries to his face and hand. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

- *March 31, 2017*- PBSO deputy Tasers a person suspected of taking a fighting stance and resisting arrest for a "beverage violation." The PBSO deputy Tasers the person twice in the abdominal area. Deployment is in violation of policy due to the non-violent nature of the offense, the level of threat, and the low risk of harm to deputies. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *April 2, 2017*- PBSO deputy Tasers a person suspected of "concealing items in a backpack." The subject has two outstanding warrants and begins to flee when advised of the warrants.   The PBSO deputy Tasers the person while fleeing resulting in physical injuries.  Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense.  PBSO determines the use of force was reasonable and necessary.

- *April 4, 2017*- PBSO deputy Tasers a person suspected of burglary to a business and criminal mischief.  The person is in custody and refuses verbal commands, placing his hands in his pocket and turning his back toward the deputy.  The PBSO deputy deploys the Taser twice, striking the person in his upper and lower back. Deployment is in violation of policy due the non-violent nature of the offense, the level of threat, and the low risk of harm to deputies.  PBSO determines the use of force was reasonable and necessary.

- *April 4, 2017*- PBSO deputy Tasers a person being Baker Acted.  The deputy utilizes an "arm bar" to bring the person to the ground, and when the person begins to stand up, the deputy knee strikes him in the right hip, and then drives his Taser gun into his back deploying the Taser.  Deployment is in violation of policy due the non-violent nature of the offense, the level of threat, and the low risk of harm to deputies.  PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmgsVdEpmds-6siLsoBfUI28oYiPOu1GYQmfjkrcA?e=nZ2FT2

- *April 4, 2017*- PBSO deputy Tasers a person suspected of misdemeanor shoplifting and resisting arrest without violence. The suspect attempts to flee after refusing to be taken into custody. The PBSO deputy Tasers the person twice- in the back of the left leg and lower back, resulting in injuries. Deployment is in violation of policy due the non-violent nature of the offense, the level of threat, and the low risk of harm to deputies. PBSO determines the use of force was reasonable and necessary.

- *April 9, 2017*- PBSO deputy Tasers a person being Baker acted for "screaming and banging on doors". Two deputies simultaneously Taser the individual after he "bowed up" and refused to take his hands out of his pockets. Deployment is in violation of policy due the non-violent nature of the offense, the level of threat, and the low risk of harm to deputies. PBSO determines the use of force was reasonable and necessary.

- *April 9, 2017*- PBSO deputy Tasers a person suspected of a "possession of cocaine." The person flees on foot and is Tasered twice in the rear left tricep and left center buttock. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *April 27, 2017-* PBSO deputy Tasers a person who was a passenger in a vehicle being stopped for a suspected "traffic violation." The person flees on foot and deputies attempt unsuccessfully to Taser him twice. He is eventually apprehended. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

- *May 14, 2017-* PBSO deputy Tasers a person suspected of having an outstanding arrest warrant. When the person begins to resist, the deputy deploys his Taser. There is no documentation of the reason for the warrant nor is there a suggestion that their deputy was at risk. PBSO determines the use of force was reasonable and necessary.

- *June 4, 2017-* PBSO deputy Tasers a person who being investigated for domestic battery. The person flees upon making contact with deputies. The deputy deploys his Taser striking the person in his abdomen. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offense. PBSO determines the use of force was reasonable and necessary.

- *June 9, 2017-* PBSO deputy Tasers an inmate after he threatened to spit on a nurse. The inmate was also hit with a pepper ball and physically beaten by deputies. Deployment is in violation of policy due to the fact the person was already in custody and posed no threat of imminent harm to deputies. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *June 17, 2017-* PBSO deputy Tasers a person who is being investigated for burglary, criminal mischief and resisting arrest without violence. The person flees upon making contact with deputies. The deputy deploys his Taser striking the person in his lower/center back. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offenses. PBSO determines the use of force was reasonable and necessary.

- *June 19, 2017-* PBSO deputy Tasers a woman in custody and handcuffed, while sitting in the back of a patrol car. The person begins to kick the seat refusing to exit the patrol car. The deputy deploys his Taser on a handcuffed person striking her in the right leg. Deployment is in violation of policy due to the fact the person already in custody and posed no threat as she was already handcuffed in in custody. PBSO determines the use of force was reasonable and necessary.

- *June 25, 2017-* PBSO deputy Tasers a person during a traffic stop. The person flees upon making contact with deputies. The deputy deploys his Taser attempting to strike the person unsuccessfully. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the alleged offense. PBSO determines the use of force was reasonable and necessary.

- *July 9, 2017*- PBSO deputy Tasers a person who is identified as "mentally unstable." The person flees upon making contact with deputies by jumping into a nearby canal. As soon as the person gets out of the canal, the deputy deploys her Taser striking the person. Deployment is in violation of policy due to the non-violent nature of the offense, no documentation of any threat to officers and the drowning potential created by disabling an individual on a canal bank. PBSO determines the use of force was reasonable and necessary.

- *July 25, 2017*- PBSO deputy Tasers a person for trespassing inside Walmart. The person refuses to be taken into custody. The deputy deploys his Taser striking the person in his right-side torso. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offenses. PBSO determines the use of force was reasonable and necessary.

- *August 2, 2017*- PBSO deputy Tasers a person who is being investigated for DUI and possession of cocaine. The person begins to push away from the Deputy while being placed in the patrol car. The deputy deploys his Taser striking the person in his torso, and then delivers two closed first strikes to the person's torso and left leg. Deployment is in violation of policy due to the fact the person was in custody and the non-violent nature of the offenses. PBSO determines the use of force was reasonable and necessary.

- *October 31, 2017*- PBSO deputy Tasers a person who is identified as "bicycle violation" for riding his bike in the middle of the roadway. The person refuses to stop after being asked and the deputy deploys his Taser striking the person.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmgsVdEpmds-6slLsoBfUlZ8oYiPOu1GYQmflkrcA?e=nZ2FT2

Deployment is in violation of policy due to the non-violent nature of the offense, no documentation of any threat to officers and the risk of harm to the person of being stunned while riding the bicycle. PBSO determines the use of force was reasonable and necessary.

- *January 1, 2018-* PBSO deputy Tasers a person who is identified as "possession of narcotics and Baker Act." The person "actively resists" and the deputy deploys the Taser. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers. PBSO determines the use of force was reasonable and necessary.

- *February 15, 2018-* PBSO deputy Tasers a person for a narcotics violation. The person and is atop a fence when the deputy Tasers him. The person falls to the ground after being stunned. Deployment is in violation of policy due to the non-violent nature of the offense, no documentation of any threat to officers and the risk of harm to the person of being stunned while atop the fence. PBSO determines the use of force was reasonable and necessary.

- *March 16, 2018-* PBSO deputy Tasers a person driving a vehicle as a "habitualized traffic offender." The person flees upon making contact with deputies. The deputy deploys his Taser attempting to strike the person unsuccessfully. Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the alleged offense. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZ8oYiPOu1GYQmfIkrcA?e=nZ2FT2

23

- *March 30, 2018-* PBSO deputy Tasers a person who is identified as running in the street without any clothes on. When deputies arrive on scene, the male is at the front door of the home.    The deputy immediately Tasers the person and he falls backward, striking his head on the cement pavement.    Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers.    PBSO determines the use of force was reasonable and necessary.

- *March 31, 2018-* PBSO deputy Tasers a person who is being investigated for drug possession.    The person begins to push away from the deputy while the deputy is holding him with both hands behind his back.    He is on the ground being handcuffed when another deputy deploys his Taser striking him in the back, to "maintain control" of the person.    Deployment is in violation of policy due to the fact the person was in custody and the non-violent nature of the offenses.    PBSO determines the use of force was reasonable and necessary.

- *April 9, 2018-* PBSO deputy Tasers a person who is being investigated for "several burglaries."    The person flees upon making contact with deputies.    The deputy deploys his Taser striking the person in his lower back.    Deployment is in violation of policy due to the fact the person was fleeing and the non-violent nature of the offenses.    PBSO determines the use of force was reasonable and necessary.

- *April 11, 2018-* PBSO deputy Tasers a person during a traffic stop.    The person allegedly becomes "confrontational."    The deputy deploys his Taser striking the person on his right arm.    Deployment is in violation of policy due to the non-violent

---

nature of the alleged offense. PBSO determines the use of force was reasonable and necessary.

- *April 28, 2018*- PBSO deputy Tasers a person who is identified as "an unwanted guest at a bar." The person is accused of interfering with an investigation and taken to the ground where he resists being handcuffed. The deputy tasers the person in the back while on the ground face down. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers. PBSO determines the use of force was reasonable and necessary.

- *June 3, 2018*- PBSO deputy Tasers a person who suspected of a "traffic infraction." The person is becomes "verbally combative," at which point the offer attempts to unsuccessfully pull the person from his vehicle. The deputy then tasers the person twice in the torso while in the vehicle. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers. PBSO determines the use of force was reasonable and necessary.

- *June 24, 2018*- PBSO deputy Tasers a person who is suspected of possession of marijuana and Baker Act. The person begins to resist and the deputy tasers the person "gain compliance." Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers. PBSO determines the use of force was reasonable and necessary.

- *January 3, 2019*- PBSO deputy Tasers a person who being investigated for domestic battery. The person is handcuffed and in the back of a patrol vehicle when he begins to bang his head on the glass. The deputies remove him from the vehicle

and he is handcuffed, on the ground, and in the custody of two deputies when he begins "kicking" to avoid another restraint. While handcuffed on the ground and on his stomach, the deputy Tasers the person twice into his lower back. The deployment is in violation of policy due to the fact the person was already in custody and posed no threat to officers. PBSO determines the use of force was reasonable and necessary.

- *January 28, 2019*- PBSO deputy Tasers a person being investigated for shoplifting at Home Depot. The person runs to his vehicle and starts the engine attempting to flee. After the person starts the vehicle, the deputy deploys her Taser striking the person. The person fled the scene in his vehicle and it was "unknown as to whether he suffered injury." Deployment is in direct violation of policy due prohibiting use of Taser in a moving vehicle. PBSO determines the use of force was reasonable and necessary.

- *April 3, 2019*- PBSO deputy Tasers a person suspected of "potential felony charges." The person flees on foot toward a lake. The deputy tasers the person in the back sustaining injuries. Deployment is in violation of policy due to the fact that the person was fleeing near a lake and no documentation of any threat to officers. PBSO determines the use of force was reasonable and necessary.

- *April 14, 2019*- PBSO deputy Tasers a person who is identified as a "trespass warning." The person attempts to flee and the Deputy tasers the person in the back and in the hoodie portion of his sweatshirt, resulting in the person suffering injuries.

Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers or others. PBSO determines the use of force was reasonable and necessary.

- *May 3, 2019*- PBSO deputy Tasers a person who is identified as "Baker Act." The person is verbally resistant, refusing to be taken into custody. The deputy deploys the Taser twice into the person's back. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers or others. PBSO determines the use of force was reasonable and necessary.

- *May 16, 2019*- PBSO deputy Tasers a person who is identified as "Baker Act." The person is verbally resistant, refusing to be taken into custody. The deputy deploys the Taser twice into the person's back and chest. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers or others. PBSO determines the use of force was reasonable and necessary.

- *August 23, 2019*- PBSO deputy Tasers a person who is being investigated for being in a closed park. When the deputy approached, the person picks up a machete and begins to walk back and forth. The deputy deploys the Taser three times. Deployment is in violation of policy due to the risk of injury when holding a knife. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUlZ8oYlPOu1GVQmfIkrcA?e=nZ2FT2

- *September 21, 2019*- PBSO deputy Tasers a person who is identified as "armed disturbance." When the deputy arrives, the person has no weapon but is spraying water from a garden hose near the deputies, and swings the garden hose near the deputies. The deputies deploys the Taser five times. Deployment is in violation of numerous cycles. PBSO determines the use of force was reasonable and necessary, but warrants "further review" due to the numerous ECD cycles.

- *October 24, 2019*- PBSO deputy Tasers a person who is identified as "unattended running motor vehicle and trespassing at Walmart." The person refuses to stop while walking toward his running vehicle, and swings at the office while getting into the car. The person is in the driver's seat of the running vehicle when the deputy deploys his Taser, hitting the person. The person drives away after being stunned at a high rate of speed and is not apprehended. Deployment is in violation of policy due to the non-violent nature of the offense, the fact that the person was in the driver's seat of a running vehicle and the risk of harm to others if the person were to drive away. PBSO determines the use of force was reasonable and necessary.

- *November 9, 2019*- PBSO deputy Tasers a person who is identified as "Baker Act." The person is verbally resistant, refusing to be taken into custody. The Deputy deploys the Taser. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers or others. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *March 2, 2020-* PBSO deputy Tasers a person who is identified as "hit and run suspect." The person is physically resistant, refusing to be taken into custody. The deputy uses knee strikes to take the person to the ground, handcuffs the person and while in custody, deploys the Taser twice into the person's arm. Deployment is in violation of policy due to the fact that the person was handcuffed and in custody. PBSO determines the use of force was reasonable and necessary.

- *May 8, 2020-* PBSO deputy Tasers a person for resisting arrest. The person pushes a deputy's arm away and is forcefully taken into custody by leg sweep and vascular neck restraint. While on the ground and in the custody of two deputies, the deputy deploys her Taser three times into the persons thighs. Deployment is in violation of policy due to the fact that the person was already subdued and in the custody of two deputies. PBSO determines the use of force was reasonable and necessary.

- *May 16, 2020-* PBSO deputy Tasers a person who is identified as "driving erratically in a parking lot." The person refuses to show identification or get out of the vehicle. The officer grabs the person in a running vehicle and deploys the Taser when she resists. The person reacts by moving toward the deputy and she is stunned again twice, suffering injuries. Deployment is in violation of policy due to the non-violent nature of the offense, the fact that the person was in the driver's seat of a running vehicle and the risk of harm to others if the person were to drive away. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *June 1, 2020-* PBSO deputy Tasers a person who is identified as "driving away after an armed robbery." The person is driving away when officers approach the vehicle, attempt to grab the person through the car window and then deploys the Taser striking the individual in the back while he is driving. Deployment is in violation of policy due the fact that the person was driving a vehicle and the risk of harm to others if the person were to be incapacitated by the Taser. PBSO determines the use of force was reasonable and necessary.

- *September 3, 2020-* PBSO deputy Tasers a person during a routine traffic stop. The person is in the driver's seat of a running vehicle. The person begins to accelerate and the car is lunging forward when the deputy deploys his Taser while standing in the driver's side of the vehicle. The person is hit in the thigh and in the chest. The person drives away after being tasered twice. Deployment is in violation of policy due the fact that the person was driving a vehicle and the risk of harm to others if the person were to be incapacitated by the Taser. PBSO determines the use of force was reasonable and necessary.

- *March 25, 2021-* PBSO deputy Tasers a person who is identified as "Baker Act." The person is handcuffed in the hospital and runs to a corner where he sits down. When he goes to stand up, he knocks a deputy back and the deputy Tasers him twice. Deployment is in violation of policy due the fact that the person was already handcuffed and in custody. PBSO determines the use of force was reasonable and necessary.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmgsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

- *April 16, 2021*- PSBO deputies respond to a "welfare check," and find a person running in the road. He is in custody when the deputy deploys his taser to stop him from resisting. Deployment is in violation of policy due to the non-violent nature of the offense and no documentation of any threat to officers or others. PBSO determines the use of force was reasonable and necessary.

- *May 5, 2021*- PBSO deputies taser a person experiencing a "mental breakdown of unknow origin." The person is holding a knife attempting to cut himself but the knife is dull and he is unsuccessful. The person sits down on his porch and is distracted and calm when the first deputy deploys his taser twice. This incident also involved Sergeant Adams Lin, the same PBSO deputy who was found by a jury to have used excessive force when he unjustifiably shot Dontrell Stephens. After he is struck by the first deployment and stands up, Sergeant Lin deploys his taser two additional times. Deployment is in violation of policy due to the risk of injury when holding a knife. PBSO determines the use of force was reasonable and necessary.

See, composite taser reports, attached at *Exhibit "D."

49.     The repeated ratification of conduct clearly in violation of policies and contrary to reasonable restrictions on the use of deadly force necessary to preserve constitutionally protected rights to freedom from cruel and unusual punishment, due process of law and freedom from unreasonable seizure, gave PBSO deputies, including Deputy SULLIVAN, carte blanche to violate policies and constitutional protections with no consequences.

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6sILsoBfUlZ8oYjPOu1GYQmfIkrcA?e=nZ2FT2

*The Tasering of TIMMIE: A Tragedy Waiting to Happen*

50.     On the afternoon of Friday, May 7, 2021, TIMMIE is planning to attend a birthday party for the young child of a friend. TIMMIE is picked up by his friend, Wadoune "DD" Smith, to go to the young child's birthday party in a reserved pavilion at John Prince Park. Another young woman sits in a passenger seat, while another young man, two minors, and TIMMIE sit in the backseat of the vehicle.

51.     As they are driving to the park for the child's birthday party, heading northbound on Seminole Boulevard, Ms. Smith notices an unmarked PBSO vehicle at the intersection of Cherry Road to the west. At the intersection, Ms. Smith turns west onto Cherry Road. It is at this point that Ms. Smith and the passengers become concerned because the unmarked vehicle abruptly makes a U-turn and begins to follow them. Ms. Smith continues to drive slowly, making a right turn onto Tallahassee Drive and then another right turn onto Aspen Road, all while the unmarked vehicle follows them without sounding any sirens or declarations.

52.     Ms. Smith is not at any time speeding nor does she drive erratically. Thus, unaware of any alleged violations she has committed, and due to past incidents of aggressive behavior by PBSO, Ms. Smith, fearful of what may transpire, voluntarily pulls over into a random residential driveway at 607 Aspen Road.

53.     Although Ms. Smith, TIMMIE and the other passengers in the vehicle have done nothing wrong, Deputy SULLIVAN aggressively orders them out of the car and begins aggressively approaching them.

54.     Each one of them follows commands and calmly steps out of the vehicle. TIMMIE stands on the side of the vehicle, with empty hands, and follows instructions.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

55.     The deputies begin searching the vehicle, but do not physically search TIMMIE in any way. Deputy Christopher Francis then aggressively approaches TIMMIE with his taser drawn. Fearing for his safety, TIMMIE runs southbound on Aspen Road and hops a fence with nothing in his hands. TIMMIE always keeps his empty hands visible.

56.     In direct violation of protocol, both deputies chase TIMMIE, leaving the supposed traffic violator and other passengers at the car unattended. In pursuit of TIMMIE, Deputy Francis radios to dispatch that they have "one running" and that the call is a "Signal 19" (Signal 19 is a non-threatening misdemeanor).  Neither Deputy SULLIVAN nor Francis radios a "Signal 0" signifying a belief that the person is "armed and/or caution."

57.     Deputy SULLIVAN also radios to have more units respond. At no time does Sullivan or anyone else announce that TIMMIE is armed or that they suspect he is armed with a weapon.  As soon as he begins his pursuit, Deputy SULLIVAN removes and engages his Taser (ECD), beginning the Taser's camera footage of his pursuit and the ensuing aftermath.  He does not instruct TIMMIE to stop running or provide any other instruction or warning to him. With his Taser drawn, Deputy SULLIVAN aggressively pursues an empty-handed teenager who has committed no crime, in violation of PBSO policy.  See, real time video, attached as *Exhibit "E."

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUiZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

58.    The real-time Taser video records TIMMIE climbing empty-handed to the roof of a nearby home, on 621 Beech Road, where he immediately surrenders and puts both of his empty hands up. Although TIMMIE is atop a roof, with his back to the officers, and empty-handed, Sullivan nearly immediately Tasers TIMMIE. The Tasering is in direct violation of PBSO's "Electronic Control Device" ("ECD") policy as well as numerous state and federal policies, and the manufacturer warnings. (ECW Guidelines, 22, 31; Gen. Ord. 551.00 (Y)(1)). The policies are designed to protect against the serious risk of injury and death when a person is Tasered at a high elevation. See, real time video, attached as *Exhibit "E."

59.    As soon as the initial Taser deployment strikes TIMMIE, he loses his balance and stumbles, while still on the roof. Deputy SULLIVAN knows that the electronic charges impact TIMMIE, and he still holds the trigger for the full five second cycle thereby prolonging the disabling electrical charge administered to TIMMIE. The video clearly shows TIMMIE injured and attempting to run away, empty handed.

60.    TIMMIE briefly begins to stand and run away again, and consistent with PBSO's pattern of using unjustified, excessive force, Deputy SULLIVAN almost immediately Tasers TIMMIE again, while he is atop a roof, with his back turned and empty hands running away from the officers. As a result, TIMMIE falls from the roof to the ground in the backyard of the home, landing on his neck, severing his spinal cord and causing a permanent loss of all control of his lower extremities. See, real time video, attached as *Exhibit "E."

61.    The deputies then run to the back of the home, where TIMMIE lays immobilized, screaming and ordering him to get up. Both deputies scream at TIMMIE saying, "get up or we will slam you." TIMMIE repeatedly tells the deputies that he cannot move.

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6slLsoBfUjZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

62.     Again in direct violation of protocol, and consistent with PBSO's pattern and practice of unjustified and excessive force, and before EMS is requested, the deputies grab TIMMIE's fragile body and slam him back to the ground, further exacerbating his injuries. TIMMIE is paralyzed from the neck down and his injuries are permanent and severe.

63.     The United States Department of Justice guidelines on ECD use warn that stunning someone multiple times should be avoided because it increases the risk of serious injury or death. The guidelines also state that fleeing should not be the sole justification for using a ECD against a subject. SULLIVAN's use of the Taser under these circumstances was unwarranted and unjustified, in light of the severity of the offense, the subject's threat level to others, and the risk of serious injury to TIMMIE while standing atop a roof. SULLIVAN, consistent with PBSO's longstanding pattern and practice of excessive force, stuns TIMMIE while he is on a rooftop, in spite of the fact that he posed no threat to the officers, had not committed any crime, had his back turned to the officers and was running away, never had anything in his hands and never once reached for his pockets or anything else for that matter.  This was a completely unjustified, unwarranted abuse of power resulting in a teenager being paralyzed from the neck down.  Like all of the other instances of excessive force described above, SHERIFF BRADSHAW clears his deputies of any wrongdoing shortly after the incident and without having thoroughly investigated the circumstances of TIMMIE's catastrophic injuries.

64.     All conditions precedent to suit have been performed, have occurred, or are excused.

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

## COUNT I: 42 U.S.C. §1983 VIOLATION OF PLAINTIFF'S CIVIL RIGHTS (SULLIVAN)

65.     Plaintiff realleges paragraphs 1 through 64.

66.     SULLIVAN's actions on the afternoon of May 7, 2021, occurred within the scope of his employment with PBSO and under color of state law.

67.     SULLIVAN knew or should have known, and every reasonable Deputy Sheriff in his position would have concluded, that the circumstances preceding the Tasing of TIMMIE did not justify that use of potentially deadly force.

68.     SULLIVAN had a legal duty to use only that amount or degree of force against TIMMIE as was reasonable and necessary under the circumstances.  Pursuant to the written policies of PBSO, national police standards, and federal and state constitutional law, a police officer cannot use "excessive force," often defined as a level of force inappropriate to the circumstances, against members of the public.

69.     On May 7, 2021, SULLIVAN used an excessive and unnecessary amount of force against TIMMIE, which was objectively unreasonable in light of the facts and circumstances confronting SULLIVAN, particularly considering that (a) he lacked reasonable suspicion or probable cause, (b) the alleged violation buy an individual other than TIMMIE was a traffic infraction not even involving an accident, (c) TIMMIE posed no immediate threat to the safety of SULLIVAN or any other person.

70.     SULLIVAN knew or should have known, and every reasonable officer in that position would have concluded, that the force he used against TIMMIE was unlawful and not proportional to any alleged offense.

71.    SULLIVAN violated TIMMIE's constitutional rights to be secure in his person, free from unreasonable seizure and from the use of excessive force.

72.    These violations were of a type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established.

73.    SULLIVAN acted knowingly, intentionally, and maliciously, and/or with a reckless or callous indifference to the federally protected rights of TIMMIE.

74.    As a direct and proximate result of SULLIVAN's violation of TIMMIE's civil rights, TIMMIE has suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

75.    Plaintiff has retained the undersigned attorneys to prosecute this action on his behalf and has agreed to pay them a reasonable fee and to reimburse the costs of this action.

**WHEREFORE,** Plaintiff demands judgment against SULLIVAN for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

## COUNT II: 42 U.S.C. § 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS (BRADSHAW)

76.    Plaintiff realleges paragraphs 1 through 64.

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

77.     At all material times, BRADSHAW was responsible for PBSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

78.     At all times material hereto, BRADSHAW was charged with the responsibility of adopting and implementing rules, policies, practices, customs, and procedures for the proper and efficient maintenance, supervision, and control of PBSO deputy sheriffs.  These duties include, but are not limited to:

> (a) To create, adopt, and implement rules, regulations, practices, and procedures, toward hiring, supervising, and retaining law enforcement officers who do not have a propensity towards violence and the excessive use of force;

> (b) To create, adopt, and implement rules and regulations, practices and procedures, for proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure the utilization of a force continuum which prevents any propensity towards violence and excessive force, and which ensures that the least amount of force would be utilized to maintain order and control;

> (c) To create, adopt, and implement rules and regulations, practices and procedures for proper community policing, ensuring elimination of improper "stop and frisk" tactics without reasonable suspicion and probable cause, particularly when such tactics are disproportionately directed at African-American males;

> (d) To create, adopt, and implement rules and regulations, practices, and procedures for the proper and efficient supervision, control, discipline, and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subjected to excessive force or unnecessary force by the agents and employees of the PBSO; and

> (e) To implement rules, regulations, policies, practices, and procedures for the proper and efficient supervision, discipline, control, and investigation of law enforcement officers to reduce or eliminate instances of untruthfulness, including excessive force and instances of

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZ8oYlPQu1GYQmflkrcA?e=nZ2FT2

corroboration or ratification of untruthful accounts of excessive force events committed by fellow law enforcement officers.

79.     BRADSHAW owed a legal duty to TIMMIE to exercise reasonable care in hiring, training, and retaining safe and competent employees. TIMMIE was in the zone of risk that was reasonably foreseeable to BRADSHAW. BRADSHAW breached that duty and the breach caused TIMMIE's damages.

80.     In addition, BRADSHAW, with deliberate indifference to the possibility of TIMMIE's injuries, has encouraged the well-settled policy, practice, and custom of using "shoot first" tactics, absent any reasonable suspicion or probable cause to believe that these individuals have committed a criminal act, in any area deemed to be "high crime." This invariably involves, in particular and in disproportionate number, African-American males such as TIMMIE, thereby resulting in deputy sheriffs, such as SULLIVAN, engaging in the unwarranted use of "shoot first" tactics. Despite knowing of the unconstitutional behavior and the need to take corrective action, BRADSHAW has failed to do so.

81.     BRADSHAW has also, with deliberate indifference as to the possibility of TIMMIE's injuries, failed to adequately train or otherwise supervise and direct PBSO and its deputy sheriffs concerning the rights of the citizens they encounter in their duties, such that it is a well-settled policy, practice, and custom for deputy sheriffs, including SULLIVAN, to take extreme and reckless actions against the citizens of Palm Beach County they encounter, including TIMMIE, all in the name of self-defense, resulting in "trigger happy" deputy sheriffs seriously injuring and killing citizens.

---

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmasVdEpmds-6silsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

82.     BRADSHAW was on notice, by this history of widespread abuse, of the need to correct the well-settled policy, practice, and custom of his deputy sheriffs' extreme and reckless actions against the citizens of Palm Beach County.  This need for more or different training has been so obvious and the inadequacy of same, combined with BRADSHAW's conscious choice not to act, has resulted in the violation of constitutional rights, including, but not limited to the deprivation of TIMMIE's civil rights.

83.     In further disregard of the rights of citizens of Palm Beach County, BRADSHAW has, with deliberate indifference, either failed to direct, failed to otherwise fully require, or has sought to limit, PBSO and others in the proper investigation of the extreme and wanton acts of his deputy sheriffs, such that it is the well-settled policy, practice, and custom of PBSO to limit internal investigations, with few or no serious questions ever raised as to a deputy sheriff's decision to use excessive force and/or deadly force.  Despite knowing of this behavior and the need to take corrective action, BRADSHAW has declined to do so.

84.     By limiting and/or failing to properly investigate, resulting in findings of no excessive force and the justification for deputy sheriffs' extreme actions, by encouraging the well-settled policy, practice, and custom of using unlawful "stop and frisk" tactics, absent any reasonable suspicion or probable cause to believe that these individuals have committed a criminal act, and through allowing the well-settled policy, practice, and custom of deputy sheriffs' extreme and reckless actions against the citizens of Palm Beach County, BRADSHAW has ratified, condoned, and consented to deputy sheriffs' unlawful conduct, specifically including the unlawful conduct of SULLIVAN as to TIMMIE.  The ratification, condoning of, and consenting to, prior unlawful conduct of other deputy sheriffs served as a substantial contributing cause of and an

*All Exhibits are on the provided OneDrive Link: https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmosVdEpmds-6slLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

inducement to SULLIVAN to violate TIMMIE's civil rights, and the ratification, condoning of, and consenting to the violation of TIMMIE's civil rights confirmed that SULLIVAN's conduct conformed with BRADSHAW's policy, practice, and procedure.

85.    BRADSHAW was on notice of the consequences of the history of failing to properly investigate (and thus address and correct) the extreme and wanton acts of his deputy sheriffs and failed to address those consequences, leading to TIMMIE's deprivation of civil rights. The deprivation of civil rights, of which the circumstances described herein were a material part, together constituted a widespread pattern sufficient to notify BRADSHAW and were obvious, flagrant, rampant, and of continued duration rather than isolated occurrences.

86.    As described more fully above, PBSO's deputies have a history of repeated excessive use of force incidents causing injuries and violations of citizens' rights, of which BRADSHAW was aware. SULLIVAN was not counseled on correction of such excessive use of force causing injuries by his supervisors, including BRADSHAW. BRADSHAW knew or should have known SULLIVAN had a propensity for misconduct, including excessive use of force against members of the public. Instead, BRADSHAW ratified and condoned SULLIVAN's unlawful behavior, which was a moving force and/or proximate cause of injuries to TIMMIE.

87.    The actions committed by SULLIVAN against TIMMIE were proximately caused by the well-settled policies, customs, practices, and procedures of BRADSHAW in failing to fulfill his duties as alleged herein, which was also the moving force behind TIMMIE having his civil rights violated.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6siLsoBfUIZBoYIPOu1GYQmflkrcA?e=nZZFT2

88.     In addition to the well-settled policies, customs, practices, and procedures referenced above, BRADSHAW was grossly negligent, reckless, or deliberately indifferent to the health, safety, and welfare of TIMMIE, in that BRADSHAW expressly acknowledged and assented to the failure to properly train, supervise, control, conduct proper investigation into prior excessive behavior, screen and review for continued employment, the person and conduct of SULLIVAN. As a result, BRADSHAW knew or had reason to know that SULLIVAN would act unlawfully and he failed to stop SULLIVAN's actions, resulting in the violation of TIMMIE's civil rights.

89.     The above-described well-settled customs and policies demonstrate a deliberate indifference on the part of BRADSHAW, as the policymaker of PBSO, to the constitutional rights of persons within Palm Beach County and were a moving force or proximate cause of violations of TIMMIE's rights alleged herein. Despite knowing of the unconstitutional behavior and the need to take corrective action, BRADSHAW has declined to do so.

90.     As a direct and proximate result of BRADSHAW's actions and inactions, under color of state law, and in violation of 42 U.S.C. § 1983, TIMMIE was deprived of his constitutional rights to be secure in his person, free from unreasonable seizure and from the use of excessive force.

91.     As a direct and proximate result of the violation of TIMMIE's civil rights, TIMMIE has suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss

of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

**WHEREFORE**, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

## COUNT III: BATTERY
## (BRADSHAW)

92.     Plaintiff realleges paragraphs 1 through 64.

93.     TIMMIE suffered a harmful and offensive contact when he was Tasered by SULLIVAN.

94.     SULLIVAN was acting in the scope of his employment.

95.     SULLIVAN acted intentionally but not in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

96.     Pursuant to Florida Statute 768.28(9), BRADSHAW is vicariously liable, but SULLIVAN is not personally liable, for SULLIVAN's battery.

97.     As a direct and proximate result of SULLIVAN's battery, TIMMIE has suffered damages, including bodily injury, pain and suffering, disability, disfigurement, mental anguish, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6sILsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

**WHEREFORE**, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

### COUNT IV: BATTERY
### (SULLIVAN)

98.     Plaintiff realleges paragraphs 1 through 64.

99.     TIMMIE suffered a harmful and offensive contact when he was Tasered by SULLIVAN.

100.    SULLIVAN was acting in the scope of his employment.

101.    SULLIVAN acted intentionally, in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

102.    As a direct and proximate result of SULLIVAN's battery, TIMMIE has suffered damages, including bodily injury, pain and suffering, disability, disfigurement, mental anguish, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

**WHEREFORE**, Plaintiff demands judgment against SULLIVAN for compensatory damages, punitive damages, costs, and such other and further relief as the Court deems appropriate.

### COUNT V: NEGLIGENT USE OF ELECTRONIC CONTROL DEVICE
### (BRADSHAW)

103.    Plaintiff realleges paragraphs 1 through 64.

104.    SULLIVAN's conduct of chasing and tasing TIMMIE, while TIMMIE was at a point of elevation, created a foreseeable zone of risk. SULLIVAN owed a duty to all within the

zone, including TIMMIE, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others including TIMMIE from the harm that the risk imposes.

105.    SULLIVAN breached his duty of care to TIMMIE by virtue of SULLIVAN's negligent handling of an ECD and his negligent decision to use a ECD as to TIMMIE.

106.    Pursuant to Florida Statute 768.28(9), BRADSHAW is vicariously liable, but SULLIVAN is not personally liable, for SULLIVAN's negligence.

107.    As a direct and proximate result of SULLIVAN's negligence, TIMMIE has suffered grievously, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, expensive hospitalization, and medical care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

**WHEREFORE**, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

## COUNT VI: NEGLIGENT SUPERVISION, RETENTION, AND TRAINING (BRADSHAW)

108.    Plaintiff realleges paragraphs 1 through 64.

109.    BRADSHAW owes a legal duty to supervise PBSO deputy sheriffs, retain only those fit for duty, and provide necessary and appropriate discipline, training, and retraining.

110.    During the course of SULLIVAN's employment, BRADSHAW became aware or should have become aware of problems with SULLIVAN that indicated his unfitness, specifically his propensity for violating citizens' civil rights and using excessive force.

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmgsVdEpmds-6sjLsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

111.    SULLIVAN, according to TIMMIE and the other passengers in the vehicle, had a history of abusive, aggressive behavior and a reputation for harassing individuals in "high crime areas without probable cause. It was this behavior that gave the driver and passengers pause for concern regarding their safety on the day of the incident. As noted in the YouTube video and as illustrated by the Taser use history outlined above, PBSO deputies including SULLIVAN were repeatedly encouraged to engage in improper behavior, which was ratified by BRADSHAW.

112.    TIMMIE fell within the zone of foreseeable risk created by SULLIVAN's employment.

113.    As a direct and proximate result of BRADSHAW's negligent supervision, retention, and training of SULLIVAN, TIMMIE was subjected to injury, including deprivations of his civil rights and a battery. TIMMIE has suffered grievously, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, expensive hospitalization, and medical care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition. The losses are permanent and/or continuing and TIMMIE will continue to suffer losses in the future.

**WHEREFORE**, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands trial by jury for all issues appropriately tried by a jury.

[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6sILsoBfUlZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

46

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was E-filed and submitted to a process server for service upon the Defendants in this matter this 24th day of February, 2023.

*/s/ Rosalyn Sia Baker-Barnes*
**ROSALYN SIA BAKER-BARNES**
Florida Bar No.: 327920
Primary E-mail: rsb@searcylaw.com
Secondary Email:_baker-barnesteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9401
*Attorney for Plaintiff*

**JOHN SCAROLA**
Florida Bar No.: 169440
Primary E-mail: jsx@searcylaw.com
Secondary Email: _scarolateam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9451
*Attorney for Plaintiff*

---

*All Exhibits are on the provided OneDrive Link:* https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-6silsoBfUIZ8oYlPOu1GYQmflkrcA?e=nZ2FT2

IN THE CIRCUIT COURT FOR THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA

**TIMMIE LEE KNOX, JR.,**

  **Plaintiff,**

CASE NO:

v.

**RIC BRADSHAW, in his capacity as Sheriff
of Palm Beach County, Florida, and
DEPUTY SHERIFF DUSTIN SULLIVAN,
individually,**

  **Defendants.**

_____/

### <u>NOTICE OF FILING EXHIBITS WITH COMPLAINT</u>

  **COMES NOW** the Plaintiff, TIMMIE LEE KNOX, JR., by and through the undersigned

counsel, hereby provides notice that the following exhibits to the Complaint is provided in the

following OneDrive Link listed below:

  1. Exhibit "A", 768.28 Letter and Certified Green Cards;

  2. Exhibit "B", PBSO Use of Force Policy, General Order 550.00;

  3. Exhibit "C", PBSO Authorized Weapons and Ammunition, General Order 551.00;

  4. Exhibit "D", Composite Taser Reports; *and*

  5. Exhibit "E", Real Time Video.

  **OneDrive Link:** https://searcylawfirm.sharepoint.com/:f:/s/baker-barnesteam1/EnpEtzmqsVdEpmds-
6siLsoBfUlZ8oYlPOu1GYQmfIkrcA?e=nZ2FT2

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

Knox vs. Bradshaw, et. al.
Notice of Filing Exhibits

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was E-filed and submitted to a process server for service upon the Defendants in this matter this 24<u>th</u> day of <u>February,</u> 2023.

                        */s/ Rosalyn Sia Baker-Barnes*
                        **ROSALYN SIA BAKER-BARNES**
                        Florida Bar No.:  327920
                        Primary E-mail: rsb@searcylaw.com
                        Secondary Email:  baker-barnesteam@searcylaw.com
                        Searcy Denney Scarola Barnhart & Shipley, P.A.
                        2139 Palm Beach Lakes Boulevard
                        West Palm Beach, Florida 33409
                        Telephone: (561) 686-6300
                        Facsimile: (561) 383-9401
                        *Attorney for Plaintiff(s)*

                        **JOHN SCAROLA**
                        Florida Bar No.:  169440
                        Primary E-mail: jsx@searcylaw.com
                        Secondary Email:  scarolateam@searcylaw.com
                        Searcy Denney Scarola Barnhart & Shipley, P.A.
                        2139 Palm Beach Lakes Boulevard
                        West Palm Beach, Florida 33409
                        Telephone: (561) 686-6300
                        Facsimile: (561) 383-9451
                        *Attorney for Plaintiff(s)*

NOT A CERTIFIED COPY

2

Filing # 167538684 E-Filed 02/24/2023 06:05:49 PM

IN THE CIRCUIT COURT FOR THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA

**TIMMIE LEE KNOX, JR.,**

CASE NO:

        **Plaintiff,**

**vs.**

**RIC BRADSHAW, in his capacity as
Sheriff of Palm Beach County, Florida, and
DEPUTY SHERIFF DUSTIN SULLIVAN,
Individually,**

        **Defendants.**

_____/

### NOTICE OF SERVING INTERROGATORIES TO DEFENDANTS

    Plaintiff, TIMMIE LEE KNOX, JR., by and through his undersigned counsel, hereby gives

notice pursuant to Rule 1.340(e), Florida Rules of Civil Procedure, that Interrogatories numbered

1 through 5 have been directed to Defendants, RIC BRADSHAW, in his capacity as Sheriff of

Palm Beach County, Florida, and DEPUTY SHERIFF DUSTIN SULLIVAN, Individually.

    It is requested that the aforesaid answers be served within forty-five (45) days at the offices

of Searcy Denney Scarola Barnhart & Shipley, P.A.

### CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was E-filed and

submitted to a process server for service upon the Defendants with the Summons and Complaint

in this matter this <u>24th</u> day of February 2023.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

Knox v. Bradshaw, etal.
Notice of Serving Interrogatories to Defendants
Case No.:

/s/ Rosalyn Sia Baker-Barnes
**ROSALYN SIA BAKER-BARNES**
Florida Bar No.:  327920
Primary E-mail: rsb@searcylaw.com
Secondary Email: _baker-barnesteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9401
*Attorney for Plaintiff(s)*

**JOHN SCAROLA**
Florida Bar No.:  169440
Primary E-mail: jsx@searcylaw.com
Secondary Email: _scarolateam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Telephone: (561) 686-6300
Facsimile: (561) 383-9451
*Attorney for Plaintiff(s)*

Knox v. Bradshaw, etal.
Notice of Serving Interrogatories to Defendants
Case No.:

## INTERROGATORIES TO DEFENDANTS

*(If answering for another person or entity, answer with respect to that person
or entity, unless otherwise stated.)*

1.  State separately as to each lethal shooting by a PBSO Deputy Sheriff between
    January 2005 and the date of the response to these Interrogatories:

    a.  the date of the shooting and name of the decedent;

    b.  the name of each deputy who fired the lethal shot(s);

    c.  the name and last known address of each person known to have witnessed the
        circumstances leading up to and including the shooting;

    d.  the name and last known address of each person who participated in conducting
        any internal investigation of the shooting;

    e.  the date and time any internal investigation began and ended;

    f.  the date and time that any public comment regarding the shooting was made by
        or on behalf of Ric Bradshaw;

Knox v. Bradshaw, etal.
Notice of Serving Interrogatories to Defendants
Case No.:

      g.  the content of each public comment regarding the shooting;

      h.  a detailed description of the facts leading up to and including the shooting including all facts and circumstances alleged to justify the shooting;

      i.  whether any disciplinary, remedial, or corrective action was taken by or on behalf of Ric Bradshaw in relation to the shooting, and, if so, a detailed description of each such action including when the action was taken, by whom it was taken and why it was taken.

2.     State separately as to each deployment of a Taser by a PBSO Deputy Sheriff as referenced in Paragraph 48 of the pending Complaint and in relation to the tasing of TIMMIE LEE KNOX, JR.:

      a.  the name and last known address of each person known to have witnessed the circumstances leading up to and including the Taser deployment;

      b.  the name and last known address of each person who participated in conducting any internal investigation of the Taser deployment;

      c.  the date and time any internal investigation began and ended;

      d.  the date and time that any public comment regarding the Taser deployment was made by or on behalf of Ric Bradshaw;

      e.  the content of each public comment regarding the Taser deployment;

Knox v. Bradshaw, etal.
Notice of Serving Interrogatories to Defendants
Case No.:

      f.  a detailed description of the facts leading up to and including the Taser deployment which the defense contends justify the Taser deployment;

      g.  whether any disciplinary, remedial, or corrective action was taken by or on behalf of Ric Bradshaw in relation to the Taser deployment, and, if so, a detailed description of each such action including when the action was taken, by whom it was taken, and why it was taken.

3.     How many times since January 2005 have complaints been lodged against PBSO Deputy Sheriffs alleging the excessive use of force?

4.     How many times since January 2005 have complaints alleging the excessive use of force by a PBSO Deputy Sheriff been found to be justified?

5.     Describe all corrective, remedial and/or disciplinary action taken by or on behalf of Ric Bradshaw in his capacity as Sheriff of Palm Beach County which action was in response to a complaint alleging the excessive use of force by a PBSO Deputy Sheriff.

Knox v. Bradshaw, etal.
Notice of Serving Interrogatories to Defendants
Case No.:

_____

STATE OF _____ )

COUNTY OF _____ )

      Sworn to (or affirmed) and subscribed before me by means of

☐ Physical presence or   ☐   online notarization this _____ day of _____, 20____

By_____
                      (name of individual Acknowledging)

Individual identified by ☐ Personal Knowledge ☐ Satisfactory Evidence, Type _____

(SEAL)

                          _____
                          Notary Signature

                          _____
                          Notary name - print

                          NOTARY PUBLIC, State of Florida

                          _____
                          (Serial number, if any)

Filing # 167538684 E-Filed 02/24/2023 06:05:49 PM

'

IN THE CIRCUIT COURT FOR THE
FIFTEENTH JUDICIAL CIRCUIT, IN
AND FOR PALM BEACH COUNTY,
FLORIDA

TIMMIE LEE KNOX, JR.,

CASE NO:

      Plaintiff,

vs.

RIC BRADSHAW, in his capacity as Sheriff
of Palm Beach County, Florida, and
DEPUTY SHERIFF DUSTIN SULLIVAN,
Individually,

      Defendants.
_____/

## REQUEST TO PRODUCE TO DEFENDANTS

Plaintiff, TIMMIE LEE KNOX, JR., by and through his undersigned counsel, requests,
Pursuant to Rule 1.350 of the Florida Rules of Civil Procedure, that Defendants, RIC BRADSHAW, in
his capacity as Sheriff of Palm Beach County, Florida, and DEPUTY SHERIFF DUSTIN
SULLIVAN, Individually, produce and permit Plaintiff, TIMMIE LEE KNOX, JR., to inspect and
copy each of the following documents*:

      1.     The complete internal investigation file with respect to every lethal shooting by a
Deputy Sheriff between 2005 and the date of the response to this production request.

      2.     The complete internal investigation file, and all video evidence, with respect to
every Taser deployment by a PBSO Deputy Sheriff as referenced in Paragraph 48 of the pending
Complaint and in relation to the tasering of TIMMIE LEE KNOX, JR.

      3.     A copy of each written, audio, and video public comment made by or on behalf of
Ric Bradshaw with respect to every lethal shooting by a Deputy Sheriff and every Taser
deployment by a Deputy Sheriff.

Knox v. Bradshaw, etal.
Request to Produce to Defendants

4.      A complete copy of every complaint alleging an excessive use of force by a PBSO

Deputy Sheriff from January 2005 to the present, and all documents* reflecting any investigation

of the complaint and the results of any such investigation.

5.      All documents* reflecting corrective, remedial and/or disciplinary action taken by

or on behalf of Ric Bradshaw in response to a complaint alleging an excessive use of force by a

PBSO Deputy Sheriff.

*"Documents" shall include, but not be limited to all non-identical copies of writings,

drawings, graphs, charts, photographs, phono-records, recordings, and/or any other data

compilations from which information can be obtained, translated, if necessary, by the party to

whom the request is directed through detection devices into reasonably usable form. "Documents"

also include all electronic data as well as application metadata and system metadata. All

inventories and rosters of your information technology (IT) systems—e.g., hardware, software and

data, including but not limited to network drawings, lists of computing devices (servers, PCs,

laptops, PDAs, cell phones, with data storage and/or transmission features), programs, data maps

and security tools and protocols.

It is requested that the aforesaid production be made within 45 days of service of this

request at the offices of Searcy Denney Scarola Barnhart & Shipley, P.A., Inspection will be made

by visual observation, examination and/or copying.

**[CERTIFICATE OF SERVICE ON FOLLOWING PAGE]**

2

Knox v. Bradshaw, etal.
Request to Produce to Defendants

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that a true and correct copy of the foregoing was E-filed and submitted to a process server for service upon the Defendants with the Summons and Complaint in this matter this 24th day of February 2023.

                                   */s/ Rosalyn Sia Baker-Barnes*
                                   **ROSALYN SIA BAKER-BARNES**
                                   Florida Bar No.: 327920
                                   Primary E-mail: rsb@searcylaw.com
                                   Secondary Email: _baker-barnesteam@searcylaw.com
                                   Searcy Denney Scarola Barnhart & Shipley, P.A.
                                   2139 Palm Beach Lakes Boulevard
                                   West Palm Beach, Florida 33409
                                   Telephone: (561) 686-6300
                                   Facsimile: (561) 383-9401
                                   *Attorney for Plaintiff(s)*

                                   **JOHN SCAROLA**
                                   Florida Bar No.: 169440
                                   Primary E-mail: jsx@searcylaw.com
                                   Secondary Email: _scarolateam@searcylaw.com
                                   Searcy Denney Scarola Barnhart & Shipley, P.A.
                                   2139 Palm Beach Lakes Boulevard
                                   West Palm Beach, Florida 33409
                                   Telephone: (561) 686-6300
                                   Facsimile: (561) 383-9451
                                   *Attorney for Plaintiff(s)*

3

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: STANDING ORDER FOR
CASE MANAGEMENT FOR SUBMISSION
OF AGREED CASE MANAGEMENT PLAN FOR
CASES FILED ON OR AFTER APRIL 30, 2021

_____/

## STANDING ORDER FOR CASE MANAGEMENT AND SUBMISSION OF AGREED CASE MANAGEMENT PLAN IN CIVIL CASES IN THE FIFTEENTH JUDICIAL CIRCUIT FILED ON OR AFTER APRIL 30, 2021 (DCMSO)

Pursuant to Florida Rule of Civil Procedure 1.200(a), Florida Rule of General Practice and Judicial Administration 2.545, and Administrative Order 3.107 entered by the Chief Judge of this Circuit, the parties are informed of the following information and procedures applicable to civil lawsuits filed in the Circuit Court on or after April 30, 2021:

1. **SERVICE OF THIS ORDER.** The Plaintiff is directed to serve a copy of this Order with each Summons issued in this case. One copy of this Order is to be filed with the Clerk of the Circuit Court with proof of service.

2. **CIVIL CASE MANAGEMENT SYSTEM.** The Supreme Court of Florida has established guidelines for the prompt processing and resolution of civil cases. This Court has adopted a case management system to help meet those guidelines. In contested cases, the parties are required to participate in the case management system. The case management system requires early consultation and cooperation among the parties for the preparation and submission of an Agreed Case Management Plan and early involvement by the Court. The Agreed Case Management Plan requires the parties to identify a case track, confer in good faith and attempt to narrow the matters in controversy, identify the issues that require direct involvement by the Court, and establish a schedule for addressing those issues.[1] The Agreed Case Management Plan may be accessed at the Court's website at: https://15thcircuit.com/civil-differentiated-forms-and-orders.

Unless all of the Defendants have been served and have been defaulted or dropped, an Agreed Case Management Plan must be submitted to the assigned divisional queue via the Court's online scheduling system (OLS) as an attachment, in PDF format, to a proposed Order Accepting Agreed Case Management Plan on or before 130 days from the date of filing of the initial complaint. If the parties are unable to agree on an Agreed Case Management Plan by the applicable deadline, a

---

[1] Case Track options include Expedited, Streamlined, General, or Complex. Case Tracks have been established in order to comply with the case disposition standards set forth in Florida Rule of General Practice and Judicial Administration 2.250(a)(1)(B).

case management conference will be scheduled by the Court or the Court will review and issue an Order Implementing Case Management Plan without agreement of the Parties. No matters that arise as a result of this standing order, including lack of agreement, will be set on the Court's Uniform Motion Calendar and will, instead, be settled by the Court either at the case management conference or via an Order Implementing Case Management Plan without agreement of the parties. If a case management conference is scheduled, attendance by trial counsel and those parties who are not represented by counsel is mandatory.

If all Defendants are served and defaulted or dropped, the Plaintiff will file the appropriate documentation to pursue a Default Final Judgment within 130 days of the filing of the complaint and Final Judgment is to be entered or set for hearing within 150 days of the filing of the complaint.

    3. **MEDIATION/ALTERNATIVE DISPUTE RESOLUTION (ADR)**. ADR provides parties with an out-of-court alternative to settling disagreements. Mediation is a type of ADR wherein an independent third party attempts to arrange a settlement at a conference between the parties. The Court requires the parties to participate in Mediation prior to trial unless the parties agree to another form of ADR.

    **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, on this 26 day of April, 2021.

15TH JUDICIAL CIRCUIT
ADMINISTRATIVE OFFICE OF THE COURTS

**Administrative Circuit Judge**